UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
MEXICAN HASS AVOCADO IMPORTERS ASSOC.,

                        Plaintiff,         <u>MEMORANDUM & ORDER</u>
                                           09-CV-5522(JS)(WDW)

       -against-

THE PRESTON/TULLY GROUP INC.,

                        Defendant.
----------------------------------------X
APPEARANCES
For Plaintiff:      Anthony Filosa, Esq.
                  David I. Rosenberg, Esq.
                  Rosenberg, Fortuna & Laitman, LLP
                  666 Old Country Road, Suite 810
                  Garden City, NY 11530

For Defendant:      E. Christopher Murray, Esq.
                  Ruskin Moscou Faltischek, P.C.
                  1425 RXR Plaza, East Tower, 15th Floor
                  Uniondale, NY 11556

SEYBERT, District Judge:

        Plaintiff Mexican Hass Avocado Importers Association ("MHAIA" or "Plaintiff") commenced this diversity action on December 17, 2009 against Defendant Preston/Tully Group Inc. ("Preston/Tully" or "Defendant") asserting claims for breach of contract, an accounting, and fraud. On June 20, 2011, Plaintiff moved for partial summary judgment as to liability on its breach of contract claim. On July 21, 2011, Defendant opposed and cross-moved for summary judgment on all claims. Presently pending before the Court are the parties' cross-motions. For

the following reasons, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED IN PART AND DENIED IN PART.

BACKGROUND[1]

I.   Factual Background

MHAIA was formed in 2003 by importers of Mexican Hass avocados to promote the sale of avocados of Mexican origin in the United States.  Using assessments collected by the United States Department of Agriculture ("USDA") pursuant to the Hass Avocado Promotion, Research and Information Act of 2000, 7 U.S.C. § 7801 et seq., MHAIA entered into a series of "Promotional Services Agreements," with Preston/Tully whereby Preston/Tully agreed to develop and implement an integrated marketing campaign for Mexican Hass avocados.  (Pl. Exs. K-N; Def. Exs. 1-5.)

The parties entered into the first Promotional Services Agreement in March 2004, which covered the period between March 2004 and December 2004 (Def. Ex. 1, "2004 Contract"), and the second in August 2004, which covered the period between August 2004 and December 2005 (Pl. Ex. K & Def. Ex. 2, "2004-2005 Contract").  The parties performed under these contracts without issue, and they are not the subject of this

---

[1] The following facts are drawn from the parties' Local Civil Rule 56.1 Statements and the exhibits attached to the affidavits submitted in support of the cross-motions.  Any relevant factual disputes are noted.

2

lawsuit.  MHAIA subsequently entered into three additional one-year Promotional Services Agreements with Preston/Tully.  The Court will discuss the details of each in turn.

A.   2005-2006 Contract

On or about October 1, 2005, the parties entered into a new Promotional Services Agreement covering the period between November 1, 2005 and October 31, 2006 (Pl. Ex. L & Def. Ex. 3, "2005-2006 Contract").  The 2005-2006 Contract, like the ones prior, was drafted in the form of a letter on Preston/Tully letterhead.  The letter was from Christopher Tully, the President and sole owner of Preston/Tully, to Mr. E. Figueroa, the then-Chairman of the MHAIA Board, and was signed by both individuals.  The letter set out to "outline [the parties'] understanding of the promotional campaign, and list the services [Preston/Tully] will provide, as well as the payment schedule for [those] services." (2005-2006 Contract, at 1.)  Pursuant to the terms of the agreement, Preston/Tully agreed to provide the following services:

- Development of marketing conceptual plan, communications strategy, brand positioning and its implementation[.]

- Website maintenance[.]

- Administrate co-op marketing fund used to reimburse importers for promotions executed with retailers and or [sic] in support of retailer activities.

3

- Reprint material used in point of sale program[.]

- Plan and purchase consumer advertising media in U.S. markets.

- Plan and purchase trade directed advertising.

- Conceive, develop, implement, track, administer [sic] public relations program.

- Provide campaign follow-up and administration.

(Id. at 2.)  Those services are itemized in a "line item budget" attached to the letter (id.) that was drafted by Mr. Tully[2] (see Tully Dep. 31-32).

The budget includes a list of nine items with short descriptions of the services to be provided and corresponding dollar amounts.  They are as follows:

1. $700,000 for "POS/Demo/Importer fund," which is described as "In-store demo fund used to reimburse importers for promotional efforts.  Includes demo kit fulfillment and $100,000 for supervision, administration and monitoring of program by agency."[3]  (emphasis added).

2. $106,000 for "POS material reprint," which is described as "Reprint demo kit materials including recipe brochure,

---

[2] While Mr. Tully drafted the attached budget, the body of the letter was adapted from a template of standard USDA contract language. (See Tully Dep. 15.)

[3] Although agency is not defined anywhere in the agreement, the parties do not dispute that the "agency" referred to is Preston/Tully.  (Pl. 56.1 Stmt. ¶ 10; Def. 56.1 Cntr-Stmt. ¶ 10.)

counter card, napkins, serving gloves, etc. Printing 1,000 kits English [sic]. Develop and design Hispanic POS kit. Print 1000 kits Spanish [sic]."

3. $550,000 for "Public Relations," which is described as "P.R. activities directed at trade and consumer publications editors."

4. $2,523,000 for "Radio Advertising," which is described as "Media. <u>Includes 15% Agency fee for planning and buying, verification and administration</u>. Radio Spot production (two English and two Spanish commercials). Talent and distribution." (emphasis added).

5. $176,000 for "Trade Advertising," which is described as "Design and production of one 4/c trade advertisement. Production of films & proofs. Media placements in trade publications."

6. $50,000 for "Misc. Production," which is described as "Misc. campaign production expenses."

7. $40,000 for "Website maintenance and updating," which is described as "Maintenance trade website (English and Spanish) www.mexhass.com. Consumer website www.mexhassrecipes.com maintenance and refreshing."

8. $330,000 for "Agency Administration," which is described as "Development of strategy, program plan, execution and follow-up."

9. $25,000 for "Agency Travel/Misc Expenses," which is described as "Airfare, hotel, phone, fax, deliveries, misc. expenses, etc."

(<u>Id.</u> at Attachment.) Preston/Tully may, but was not required to, subcontract specific items to outside parties. (<u>Id.</u> at 4-

5.)   Additionally, Preston/Tully was obligated under the contract to "keep accurate records, books, and documents involving transactions relating to this agreement," retain them for three years, and make them "available for inspection and audit by a representative of the Secretary of Agriculture" upon request.  (Id. at 4.)  The agreement does not contain any additional information regarding the services to be provided by Preston/Tully.

The agreement states that "[t]he total amount covered . . . is $4,500,000," which is to be paid by MHAIA to Preston/Tully in installments.  (Id. at 3.)  "If the campaign is cancelled for any reason whatsoever, Preston/Tully's entire fee for implementation, administration, and any other costs or fees incurred to date, shall, nevertheless, be deemed to have been earned and will be paid within ten (10) days of billing."  (Id. at 5 (emphasis added).)  The parties do not dispute that this constitutes the entire agreement between them.

All of the services provided for in the 2005-2006 Contract were adequately performed by either Preston/Tully or a third-party subcontractor.  Nonetheless, MHAIA asserts that Preston/Tully breached the agreement by retaining whatever remained of the $4,500,000 budget after third-party fees and expenses were paid, rather than just $330,000 for Agency Administration, $100,000 for supervising, administering and

6

monitoring the POS/Demo/Importer fund program, and 15% of the value of the radio ads purchased--the fees specifically provided for in the agreement.   Preston/Tully does not dispute that it retained the entire budget, but rather argues that it was entitled to do so under the terms of the contract.

     B.   <u>2006-2007 Contract</u>

       The parties entered into a new Promotional Services Agreement on or about September 14, 2006 covering the period between November 1, 2006 and October 31, 2007 (Pl. Ex. M & Def. Ex. 4, "2006-2007 Contract").   The substance of the 2006-2007 Contract was nearly identical to the substance of the 2005-2006 Contract with the exception of "[t]he total amount covered under th[e] agreement"--now $6,246,500 (2006-2007 Contract, at 3)--and the amounts allocated to and descriptions of certain line-items on the attached budget (<u>id.</u> at Attachment).   Five new items were added to the budget:

       1. "NASCAR Sponsorship," defined as "Consumer trade components of NASCAR sponsorship for races.   <u>Includes agency supervision</u>." (emphasis added).

       2. "NASCAR Promotion," defined as "Design, production and printing of P-O-S materials, sweepstakes, trade and consumer advertisement."

       3. "In-Store Advertising," defined as "Design, production and placement of literature and dispensers for supermarkets."

4. "Joint Consumer Promotion," defined as "Joint promotion concept, tie-in, creative development, production, printing and coupon redemption."

5. "TV Spot Creative Development," defined as "Creative development of TV commercial to animatic stage."

(Id.) Additionally, the description of the "Public Relations" services to be provided by Preston/Tully was modified to state, "Agency public relations/promotions activities directed at trade and consumer targets." (Id. (emphasis added).) The descriptions of all other line-items in the 2006-2007 budget were identical to their 2005-2006 counterparts, including $100,000 for supervision, administration and monitoring by the agency of the Importer Fund, a 15% agency fee for planning and buying radio advertising, and a flat fee ($440,000) for Agency Administration. (Id.)

All of the services provided for in the 2006-2007 Contract were adequately performed by either Preston/Tully or a third-party subcontractor. But MHAIA again asserts that Preston/Tully breached the agreement by retaining whatever remained of the $6,246,500 budget after third-party fees and expenses were paid, rather than just $440,000 for Agency Administration, $100,000 for supervising, administering and monitoring the Importer fund program, and 15% of the value of the radio ads purchased. Preston/Tully again does not dispute

that it retained the entire budget, but rather argues that it
was entitled to it under the terms of the contract.

C.   <u>2007-2008 Contract</u>

On or about September 19, 2007, the parties entered
into their final Promotional Services Agreement covering the
period between November 1, 2007 and October 31, 2008 (Pl. Ex. N
& Def. Ex. 5, "2007-2008 Contract").   The substance of the 2007-
2008 Contract was nearly identical to the substance of the 2006-
2007 Contract with the exception of "[t]he total amount covered
under th[e] agreement"--which was increased to $7,042,000 (2006-
2007 Contract, at 3), the signatory on behalf of MHAIA, now
Antonio Villasenor (<u>id.</u> at 1), and the amounts allocated to and
descriptions of certain line-items on the attached budget (<u>id.</u>
at Attachment).

The following changes were made to the descriptions in
the budget:   (i) the description of the Importer Fund (now
titled "Co-op Marketing"), although still including
"supervision, administration and monitoring of program by
agency," no longer specified the amount of the Co-op Marketing
budget that was to be allocated towards compensating the agency
for its involvement; (ii) the Advertising budget was expanded to
include both radio and television, with the budget for both
including a 15% agency fee for planning and buying; (iii) no
money was allocated for POS material reprint; and (iv) a line-

9

item was added for a "Consumer Contest"--"Make your own HASS TV spot." (2007-2008 Contract, at Attachment.)

The descriptions of all other line-items in the 2007-2008 budget were identical to their 2006-2007 counterparts, including agency supervision of the NASCAR Sponsorship, agency public relations/promotions activities, and a flat fee ($480,000) for Agency Administration. (Id.)

Either Preston/Tully or a third-party subcontractor adequately performed all of the services provided in the 2007-2008 Contract. But MHAIA asserts that Preston/Tully similarly breached this agreement by retaining whatever remained of the $7,042,000 budget after third-party fees and expenses were paid, rather than just $480,000 for Agency Administration and 15% of the value of the radio and television ads purchased. Preston/Tully again argues that it was entitled to do so under the terms of the contract.

II.  Procedural Background

MHAIA commenced this action in December 2009 asserting causes of action for breach of the 2005-2006, 2006-2007 and 2007-2008 Contracts, for an accounting, and for fraud in the inducement. On June 20, 2011, MHAIA moved for summary judgment as to liability on its breach of contract claims, arguing that the contracts (more specifically the budgets attached thereto) unambiguously state precisely what Preston/Tully's compensation

was for each contract; yet Preston/Tully retained the entire budget (minus expenses) as its compensation.  On July 21, 2011, Preston/Tully filed an opposition and cross-motion for summary judgment on all claims asserting that (i) the contracts unambiguously support its position that the entire contract amount constituted its compensation and thus the contracts were not breached; (ii) that it is entitled to judgment as a matter of law on MHAIA's equitable claim for an accounting because the parties were not fiduciaries; and (iii) that the fraud claim must be dismissed as duplicative of the breach of contract claim.

<u>DISCUSSION</u>

I.   <u>Standard of Review</u>

"Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law." <u>Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortg. Corp. (In re Blackwood Assocs., L.P.)</u>, 153 F.3d 61, 67 (2d Cir. 1998) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought." McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997).

"The burden of showing the absence of any genuine dispute as to a material fact rests on the party seeking summary judgment." Id.; see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). A genuine factual issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To defeat summary judgment, "the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 256). "Mere speculation or conjecture as to the true nature of the facts" will not overcome a motion for summary judgment. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986); see also Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986) ("Mere conclusory allegations or denials will not suffice."); Weinstock, 224 F.3d at 41 ("[U]nsupported allegations do not create a material issue of fact." (citing Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)).

"The same standard applies where, as here, the parties file cross-motions for summary judgment . . . ." See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001) (citing

Terwilliger v. Terwilliger, 206 F.3d 240, 244 (2d Cir. 2000)). Thus, even if both parties move for summary judgment and assert the absence of any genuine issues of material fact, "a district court is not required to grant judgment as a matter of law for one side or the other." Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993). "Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citation omitted). It is under this framework that the Court analyzes the pending motions.

## II. Breach of Contract

Generally, "a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008) (citation omitted). "Contract language is ambiguous if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000) (quoting Sayers v.

Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1094 (2d Cir. 2000)).

Both parties argue that the 2005-2006, 2006-2007 and 2007-2008 Contracts unambiguously state the amount of compensation to which Preston/Tully was entitled. MHAIA asserts that Preston/Tully's compensation was limited to the portions of the budget that specifically provided for payment of fees to the agency: for example, the flat fee for Agency Administration and the 15% of all television and radio ads purchased; whereas Preston/Tully asserts that it was entitled to the total amount covered by the contracts at issue--in other words, the entire budget. The Court finds that an intelligent person viewing the contracts could reasonably choose either interpretation.

On the one hand, the contracts do not state that the "total amount covered" by the contracts is equal to Preston/Tully's compensation. Rather, the total amount covered is broken down in an attached "budget." Budget is not defined in the contracts, but its dictionary definition--"the amount of money that is available for, required for, or assigned to a particular purpose," Merriam-Webster's Third New Int'l Dictionary 290 (3d ed. 1993)--coupled with the fact that certain line-items specifically provide for the payment of fees to Preston/Tully supports MHAIA's interpretation that Defendant's compensation was limited to those line-items. In other words,

14

since certain line-items provide for the payment of specified fees to Preston/Tully, the other line-items must be read to exclude any payment of fees.  See Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 63 N.Y.2d 396, 403-04, 472 N.E.2d 315, 318, 482 N.Y.S.2d 465, 468 (1984) (applying the doctrine of "inclusio unius est exclusio alterius"--that to express or include one thing implies the exclusion of the other--to the interpretation of a contract).

On the other hand, there are other line-items that state that the budgeted figure "includes agency supervision" but does not specify a dollar amount.  Additionally, each of the contracts at issue provides that if the contract is cancelled for any reason, Preston/Tully will still receive its entire fee for Agency Administration, "and any other costs or fees incurred to date," see supra page 6, and none of the contracts specify what should be done if Defendant is over or under budget for a particular line item.  The Court finds that this reasonably supports Defendant's interpretation that its compensation was not limited to the flat fees specified in the budgets--namely the Agency Administration fee, the 15% fee for television and radio advertisements, and, for two out of the three years, the $100,000 for supervising and administering the Importer Fund-- and also includes costs and fees incurred by Preston/Tully in performing the other services provided for in the contracts.

15

Whether the Court draws all inferences in favor of Plaintiff or Defendant, the contract is amenable to multiple interpretations. Because a reasonably intelligent person viewing the contracts could choose either interpretation, the Court finds that the contracts are ambiguous.[4]

"Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder, the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary." Compagnie, 232 F.3d at 158 (internal quotation marks and citations omitted); accord Topps Co., 526 F.3d at 68. Plaintiff failed to cite any extrinsic evidence supporting its interpretation of the contract; therefore, the Court must deny its motion for summary judgment. Defendant, on the other hand, did provide some extrinsic evidence in support of its interpretation, specifically deposition testimony of Mr. Figueroa and Ron Campbell, MHAIA's Executive Director during the relevant time period, that if

---

[4] Plaintiff asserts that it is still entitled to summary judgment because any ambiguity must be construed against the drafter. While this is a correct statement of the law in New York, see Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 67 (2d Cir. 2000), Preston/Tully did not draft the entire contract. Rather, the record reflects that Mr. Tully drafted the budget and the body of the contract was adapted from a USDA template.

Preston/Tully provided services under a specific budget item, it would be entitled to compensation under that line-item.[5] However, this does not unambiguously support Defendant's interpretation that it was entitled to retain the <u>entire</u> budget figure; it also supports an interpretation that Preston/Tully was entitled to a fraction of the budget allocated for a particular item depending on the amount of work performed. Since it is not "so one-sided that no reasonable factfinder could decide contrary to [Defendant]'s interpretation," <u>Compagnie</u>, 232 F.3d at 159, <u>see also</u> <u>Scholastic, Inc. v. Harris</u>, 259 F.3d 73, 83 (2d Cir. 2001) ("Only in the rare case is the extrinsic evidence so one-sided that no reasonable factfinder could find to the contrary, in which event the court should resolve the ambiguity as a matter of law."), Defendant's motion for summary judgment on Plaintiff's breach of contract claims must also be denied.

---

[5] (<u>See,</u> <u>e.g.</u>, Figueroa Dep. 45 ("Q. Was it your understanding that under this item, Chris Tully would spend a[n] amount of his time for public relations on behalf of MHAIA? A. That was his job, yes. Q. Would he be entitled to be compensated for that effort through this budget item? A. Yes."); Campbell Dep. 39 ("Q. What was that $500,000 [referring to line-item on 2005-2006 Contract budget] representing? A. Public relations. Q. Those are services being performed by Preston/Tully; is that correct? A. That's correct. Q. And that's what they were being paid for, those services? A. Yes.").

III. Accounting

Defendant also argues that it is entitled to summary judgment on Plaintiff's action for an accounting because Plaintiff failed to establish the existence of a fiduciary relationship.  The Court agrees.

In New York, "[i]t is well settled that an equitable action for an accounting will not lie in the absence of a fiduciary relationship between the parties." Gersten-Hillman Agency, Inc. v. Heyman, 68 A.D.3d 1284, 1286, 892 N.Y.S.2d 209, 211 (3d Dep't 2009) (citing Bradkin v. Leverton, 26 N.Y.2d 192, 199 n.4, 209 N.Y.S.2d 192, 198 n.4, 257 N.E.2d 643, 647 n.4 (1970)); accord AHA Sales, Inc. v. Creative Bath Prods., Inc., 58 A.d.3d 6, 23, 867 N.Y.S.2d 169, 182 (2d Dep't 2008); Bouley v. Bouley, 19 A.D.3d 1049, 1051, 797 N.Y.S.2d 221, 223 (4th Dep't 2005).  "The fiduciary relationship necessary to obtain an accounting is created by the plaintiff entrusting to the defendant some money or property with respect to which defendant is bound to reveal his dealings." Stevens v. St. Joseph's Hosp., 52 A.D.2d 722, 723, 381 N.Y.S.2d 927, 929 (4th Dep't 1976). The level of trust necessary to develop a fiduciary relationship, however, is "higher . . . than [the level] normally present in the marketplace between those involved in arm's length business transactions," EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19, 832 N.E.2d 26, 31, 99 N.Y.S.2d

18

170, 175 (2005); see also AHA Sales, 58 A.D.3d at 21, 867 N.Y.S.2d at 181 ("[A] conventional business relationship, without more, is insufficient to create a fiduciary relationship." (citation omitted)); Faulkner v. Arista Records L.L.C., 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) ("Generally, an arm's length business transaction . . . is not enough to give rise to a fiduciary relationship." (internal quotation marks and citation omitted)), and "a plaintiff must make a showing of 'special circumstances' that could have transformed the parties' business relationship to a fiduciary one." AHA Sales, 58 A.D.3d at 21 (internal quotation marks and citation omitted) (finding fiduciary relationship where (i) plaintiff was induced to continue working for defendants for many years without a written contract based on representations that he could trust and rely on defendants, (ii) plaintiff refrained from other contractual relationships with defendants' competitors at defendants' insistence, and (iii) defendants demanded that plaintiff render uncompensated services as a contribution to their "venture"); see also, e.g., Apple Records, Inc. v. Capitol Records, Inc., 137 A.D.2d 50, 57-58, 529 N.Y.S.2d 279, 283 (1st Dep't 1988).

Here, although Plaintiff asserts in its papers that it "entrusted" Defendant with the amounts specified in the contracts (Pl. Reply/Opp. 18), there is no evidence in the record of any "special circumstances" that elevate the parties'

relationship to that of fiduciaries. See Faulkner, 602 F. Supp. 2d at 482. Such a conclusory allegation of trust and confidence without more will not defeat summary judgment.

Rather, Plaintiff argues that the contract language requiring Defendant to keep adequate records and make them available for inspection and audit entitles MHAIA to an accounting. (Pl. Reply/Opp. 18.) This is not an accurate statement of the law, as only the existence and breach of a fiduciary duty entitle MHAIA to an accounting. Since Plaintiff failed to put forward any evidence to support the existence of a fiduciary relationship, the Court must grant summary judgment in favor of Defendant and dismiss the cause of action for accounting.

IV. Fraud

Defendant also asserts that it is entitled to summary judgment on Plaintiff's fraud claim because it is duplicative of Plaintiff's breach of contract claim. The Court agrees. "Under New York law, a plaintiff cannot maintain a claim for both fraud and breach of contract where the alleged fraudulent misrepresentations are to the underlying terms of the contract." See Sylhan, L.L.C. v. Schwarzkopf Techs. Corp., No. 01-CV-4368, 2002 WL 32605796, at *4 (E.D.N.Y. Aug. 9, 2002) (internal quotation marks and citations omitted).

Here, Plaintiff asserts that Defendant induced MHAIA to maintain and renew its contracts with Defendant for 2006-2007 and 2007-2008 by presenting budgets to the Board of Directors "with a preconceived and undisclosed intention of not adhering to them." (Pl. Reply/Opp. 22-23.) "Although a promise made with a preconceived and undisclosed intention of not performing it can give rise to a fraudulent inducement claim, the promise must be collateral or extraneous to the terms of the agreement . . . ." D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc., 873 F. Supp. 786, 796 (E.D.N.Y. 1995). Insincere promises of future performance under a contract, like those alleged here, are not collateral or extraneous and are insufficient to allege fraud. See id. at 798; see also Caniglia v. Chi. Tribune-N.Y. Syndicate, Inc., 204 A.D.2d 233, 234, 612 N.Y.S.2d 146, 147 (1st Dep't 1994) ("It is well settled that a cause of action for fraud does not arise, where, as here, the only fraud alleged merely relates to a contracting party's alleged intent to breach a contractual obligation."); Ross v. DeLorenzo, 28 A.D.3d 631, 636, 813 N.Y.S.2d 756, 76061 (2d Dep't 2006); Gosmile, Inc. v. Levine, 81 A.D.3d 77, 81, 915 N.Y.S.2d 521, 524 (1st Dep't 2010).

Therefore, Defendant is entitled to judgment as a matter of law and the fraud claim is hereby dismissed.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for partial summary judgment (Docket Entry 23) is DENIED, and Defendant's cross-motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Accordingly, Plaintiff's causes of action for an accounting and for fraud are hereby DISMISSED.

SO ORDERED.

/s/ Joanna Seybert_____
Joanna Seybert, U.S.D.J.

Dated:     January 23, 2012
           Central Islip, NY